**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **IBT BUNKERING & TRADING MINERALOELVERTRIEB GMBH & CO. KG.** ***Plaintiff*,** | **CIVIL ACTION NO. ______________** |
| **v.** | **SECTION: ______________** |
| **M/V LIMA STRAIT (IMO No. 9626364), her engines, boilers, tackle, apparel, furniture, appurtenances, etc., in rem; WG MARINE SAGL, *in personam*; and LIMA STRAIT GMBH & CO. KG, *in personam*,** ***Defendants*** | **MAGISTRATE: ______________** **IN ADMIRALTY, Rule 9(h)** |

**PLAINTIFF'S VERIFIED ORIGINAL COMPLAINT**

Plaintiff IBT Bunkering & Trading Mineraloelvertrieb GmbH & Co. KG (**"IBT"**), for its Verified Complaint against the M/V LIMA STRAIT (IMO No. 9626364), her engines, boilers, tackle, apparel, furniture, appurtenances, etc., *in rem*, and against WG Marine SAGL and Lima Strait GmbH & Co. KG, *in personam*, alleges on knowledge as to its own acts and on information and belief as to all else:

## I.
## NATURE OF THE ACTION

1.

IBT sold and delivered marine bunker fuel to the M/V LIMA STRAIT (the "Vessel") on three occasions between October 2025 and January 2026—at Los Angeles, at Singapore, and off Colombo. The Vessel received and used the bunkers from every delivery. Her Master or Chief Engineer signed each delivery document on the Vessel's behalf, and the Vessel's stamp appears on each. No one gave IBT any notice, at any time, that the bunkers were supplied on any credit other than the Vessel's own or that the bunkers were for anyone else's account. USD 489,544.48 for the three deliveries has never been paid.

2.

IBT brings three claims. Count I is an action *in rem* against the Vessel to enforce IBT's maritime lien for necessaries under the Commercial Instruments and Maritime Liens Act, 46 U.S.C. §§ 31341–31343, with arrest under Supplemental Rule C. Count II seeks recognition and enforcement of a London arbitral award dated 3 July 2026 against WG Marine SAGL and the registered owner under the New York Convention, 9 U.S.C. §§ 201–208. Count III seeks maritime attachment of the Vessel as the registered owner's property under Supplemental Rule B.

## II.
## JURISDICTION AND VENUE

3.

This is a case of admiralty and maritime jurisdiction under 28 U.S.C. § 1333, and IBT designates it as an admiralty and maritime claim under Rule 9(h) of the Federal Rules of Civil Procedure. IBT invokes Supplemental Rule C for *in rem* process and Supplemental Rule B for maritime attachment.

4.

The Court has independent jurisdiction over Count II under 9 U.S.C. §§ 202 and 203 and 28 U.S.C. § 1331. The award was issued at London, England; it arose out of a commercial legal relationship; and that relationship is not entirely between citizens of the United States. This action is filed within three years after the award was made. 9 U.S.C. § 207.

5.

The Court has *in rem* jurisdiction over the Vessel because the Vessel is presently within the Eastern District of Louisiana at the ARTCO Midstream Buoys at Mile 110 AHP of the Mississippi River.

6.

For purposes of Count III, the Vessel is tangible property of Lima Strait GmbH & Co. KG located within this District, and neither WG Marine SAGL nor Lima Strait GmbH & Co. KG can be found within this District within the meaning of Supplemental Rule B(1), as set out in the affidavit filed with this Complaint under Supplemental Rule B(1)(b).

7.

Venue is proper under 28 U.S.C. § 1391(b)(2) and, as to the *in rem* and attachment claims, because the *res* is or will be found within this District.

## III.
## THE PARTIES

8.

IBT is a limited partnership organized under the laws of the Federal Republic of Germany, with its registered office at Bei dem Neuen Krahn 2, D-20457 Hamburg, Germany, registered at the Amtsgericht Hamburg under HRA 74407. IBT sells and delivers marine fuels internationally. IBT sold the bunkers at issue as the contracting seller and arranged their physical delivery through physical suppliers that IBT engaged for that purpose.

9.

Defendant M/V LIMA STRAIT is a Liberian-flag bulk carrier, IMO No. 9626364, call sign D5CG2, MMSI 636093065, of 22,662 gross tons and 37,187 deadweight tons, built in 2012 and classed by Nippon Kaiji Kyokai. She is named as a defendant *in rem*, together with her engines, boilers, tackle, apparel, furniture, and all other appurtenances.

10.

Defendant WG Marine SAGL ("WG Marine") is a company organized under the laws of Switzerland, with a registered address at Via Stefano Franscini 9, 6850 Mendrisio, Switzerland, and Swiss VAT registration No. CHE-227.167.094. WG Marine placed each of the three bunker orders described below.

11.

Defendant Lima Strait GmbH & Co. KG (the "Owner") is a limited partnership organized under the laws of the Federal Republic of Germany, care of Carsten Rehder Schiffsmakler und Reederei GmbH & Co. KG, Grosse Elbstrasse 42, 22767 Hamburg, Germany. It has been the Vessel's registered owner since 12 January 2022. Carsten Rehder Schiffsmakler is recorded as the Vessel's ship and commercial manager, and Victoria Marine Ship Management as her Ship Manager, each at the same Hamburg address.

## IV.
## FACTS

### A. The bunker contracts and IBT's General Terms and Conditions.

12.

Each of the three supplies was made under a written IBT order confirmation dated 8 October 2025 (Los Angeles), 21 November 2025 (Singapore), and 5 January 2026 (Colombo OPL). *See* Order Confirmations attached as Exhibit 1 (Los Angeles), Exhibit 2 (Singapore), Exhibit 3 (Colombo) (collectively, the **"Order Confirmations"**).

13.

Each of the Order Confirmations is addressed, on its face, to:

Master / Owners / Charterers of MV "LIMA STRAIT" and WG MARINE SAGL

14.

Each of the Order Confirmations is marked for the attention of "Andrew" — the individual at WG Marine with whom IBT dealt — and each identifies the Vessel by name and by IMO No. 9626364.

15.

Each of the Order Confirmations states that the "Contract is governed by IBT's General Terms an [sic] Conditions (GTC) available upon request or at our webpage www.ibtbunker.com," and describes the delivery as to be made "in close coordination with agents / masters / owners."

16.

IBT's General Terms and Conditions dated 1 January 2025 (the **"GTC"**) therefore govern each supply. *See* General Terms and Conditions, attached as Exhibit 4.

17.

Clause 1 of the GTC defines "Buyer" to mean "the mentioned Buyer under each contract as stated on Order Confirmation including all those entities mentioned in order confirmation together with vessel, master of vessel, owners, operators and/or charterers of vessel, all managers, further any party who benefits from oil consumption of vessel and any party ordering the bunker oil," all of whom "shall be severally and separately liable as Buyer under each bunker contract." Ex. 4 at 1.

18.

Clause 3.2 of the GTC provides that "[b]unkers will be delivered for account of the Buyer, which always includes the vessel and her registered owners"; that "[t]he laws of the United States, including 46 U.S.C. §§ 31341, 31342 and 31343 (CIMLA), shall govern the existence of a maritime lien regardless of the jurisdiction of legal proceedings"; and that "[a]ny order confirmation and/or bunker delivery note/receipt signed by Master (or any other officer or representative of the vessel) shall be deemed to be Incorporated with IBT's terms and conditions." Ex. 4 at 1–2.

19.

Clause 3.4 of the GTC provides that, "[e]xcept stated otherwise, deliveries shall always be performed for the account of the registered owners and for the account of the current charterers all of whom shall be jointly and severally liable for the payment of the delivery as Buyers under the Bunker Contract." Ex. 4 at 2.

20.

Clause 3.6 of the GTC provides that "[a]ny notice or any stamp in the Bunker Delivery Receipt (BDR) or similar shall not waive IBT's maritime lien on the Vessel." Ex. 4 at 2.

21.

Clause 7.9 of the GTC provides that a Buyer who fails to pay an invoice at maturity "shall pay interest at the rate stated in the Order Confirmation and Invoice," and, absent an indication in the invoice, late-payment interest of two percent per month, rising to three percent per month if payment remains outstanding three months after the invoice date, in each case *pro rata temporis* until IBT actually receives payment in full. Each Order Confirmation states that "[l]ate payments will be charged 2 % interest monthly (pro rata tempore) ex maturity until full and final settlement," which rate shall increase to 3% per month if payment remains outstanding after three (3) months. Exs. 1-3 at 3.

22.

Clause 10 of the GTC provides that "[t]he Bunker Oil supplied to the Vessel is sold and delivered on the credit of the Vessel, as well as on the promise of the Buyer to pay therefore," and that IBT "shall, among other things, enjoy full benefit of local rules granting IBT maritime lien in the Vessel and/or providing for the right to arrest the Vessel." It adds: "All and any costs associated with the exercise of these rights shall be on the Buyer's account." Ex. 4 at 5.

23.

Clause 16 of the GTC, headed "Collection and Indemnity," obliges the Buyer to pay "any and all expenses, legal fees and court costs incurred by IBT (a) to collect and obtain payment of any amount due to IBT, including but not limited to legal fees and court costs associated with enforcing a maritime lien, attachment, right of arrest, or other available remedy in law, equity or otherwise." Ex. 4 at 7.

24.

Clause 17.2 of the GTC provides that "[t]he Tribunal will apply General Maritime Law of

the United States of America with respect to the existence of IBT's maritime lien," and that "IBT shall have a maritime lien on the Vessel identified by its IMO number until payment and interest and legal cost has been received by IBT." The same clause contains the arbitration agreement described in Section G below. Ex. 4 at 7.

25.

IBT's invoices for all three supplies are likewise addressed to the "Master / Owners / Charterers of MV 'LIMA STRAIT' and WG MARINE SAGL." See Exhibits 5-7.

**B. First supply — Los Angeles, October 15, 2025.**

26.

By order confirmation dated 8 October 2025, IBT confirmed the sale of VLSFO and MGO for delivery to the Vessel at Los Angeles, naming Glencore USA as physical supplier and Moran Shipping Agencies as agent "(to be nominated)." Ex. 1 at 1.

27.

On 15 October 2025, the fuel was delivered to the Vessel at the Long Beach anchorage, California, from the barge ANNE ELIZABETH: 700.770 metric tons of VLSFO and 100.910 metric tons of MGO. This delivery was made in the United States. *See* Exhibit 8 at 1–2.

28.

Delivery is evidenced by two Marine Fuel Delivery Receipts issued by Glencore Ltd., the delivering company being Leo Marine. Each bears the Declaration of Master/Chief Engineer, is signed by the Vessel's Master or Chief Engineer, and carries the Vessel's stamp reading "LIMA STRAIT — IMO no. 9626364 — MONROVIA." Each receipt records that "[t]he marine fuel described herein is delivered in accordance with Glencore Ltd.'s Standard Terms and Conditions

for the Sale of Marine Fuels dated December 2015 … and on credit of the vessel," and that "[a]ny disclaimers as to the creation of a maritime lien in the amount of the purchase price and delivery charges and/or restrictions as to the authority of the ship's officer signing this Receipt to bind the vessel and her owner to the above are null and void, unless an authorized representative of Glencore Ltd. shall have otherwise agreed in writing at the time Buyer initially orders the marine fuel." Ex. 8 at 1 (MGO); Ex. 8 at 2 (VLSFO).

29.

IBT issued Invoice No. K2502242 dated 15 October 2025 in the sum of USD 489,075.09, payable by 13 December 2025. Ex. 5 at 1.

30.

WG Marine made two partial payments against Invoice K2502242, each after the due date and each credited to IBT's account at Deutsche Bank AG. The first, USD 200,000.00 with value date 20 January 2026, was remitted by "WG MARINE SAGL, VIA STEFANO FRANSCINI 9" and described in the remittance as "PART PAYMENT INV. NR K2502242 M/V LIMA STRAIT." The second, USD 150,000.00 with value date 26 February 2026, was remitted by the same party and described as "II PART PAYMENT INV. NR K2502242 M/V LIMA STRAIT." USD 139,075.09 of the invoice remains unpaid. *See* Payment Advices, attached as Exhibit 9.

**C. Second supply — Singapore, November 26, 2025.**

31.

By order confirmation dated 21 November 2025, IBT confirmed the sale of VLSFO for delivery to the Vessel at Singapore, with Bunker House Petroleum Pte Ltd named as physical supplier. Ex. 2 at 1.

32.

On 26 November 2025, 329.750 metric tons of VLSFO 380cst were delivered to the Vessel at Singapore, at the delivery location recorded on the delivery note as "AEPBC," from the bunker tanker MARLIN DUA. Ex. 10 at 1.

33.

Delivery is evidenced by Bunker Delivery Note No. BH-M2-00055. Under the heading "Master's / Chief Engineer's Acknowledgement," the note records: "We acknowledge receipt of the above product and confirm its intended use …." It is signed for the Vessel by her Master or Chief Engineer at 02:53 on 26 November 2025 and bears the Vessel's stamp. The note records the Vessel's owner/operator as "MASTER/OWNER." Ex. 10 at 1.

34.

IBT issued Invoice No. K2503293 in the sum of USD 163,077.50 and Debit Note No. K2503293-1 in the sum of USD 2,017.28, each dated 26 November 2025 and payable by 24 January 2026. Both remain wholly unpaid. Ex. 6 at 1–2.

**D. Third supply — Colombo, 12 January 2026.**

35.

By order confirmation dated 5 January 2026, IBT confirmed the sale of VLSFO for delivery to the Vessel off Colombo, with Lanka IOC PLC named as physical supplier. Ex. 3 at 1.

36.

On 12 January 2026, 349.952 metric tons of VLSFO were delivered to the Vessel at Colombo OPL from the bunker tanker MT SOUTHERN STAR. Ex. 11 at 1.

37.

Delivery is evidenced by Lanka IOC PLC Bunker Delivery Note Serial No. 11412, signed by the Vessel's Chief Engineer over the Vessel's stamp reading "LIMA STRAIT — IMO no. 9626364." The note records the Vessel's P&I club (Gard), her agent (Milano Shipping), and her destination port (Dammam). Its printed terms state that "the supply of marine fuel by LIOC to the Vessel is on the credit of the said Vessel," and that "[a]ny disclaimers as to the creation of and/or validity of such lien and/or restrictions as to the authority of the Master [or] his representative signing this Bunker Delivery Note to bind the Vessel and her owner to the aforementioned General Terms and Conditions are null and void." IBT pleads this language not as the source of its own lien but as evidence of what the Vessel's Chief Engineer signed for and accepted on the Owner's behalf. Ex. 11 at 1.

38.

IBT issued Invoice No. K2601011 dated 12 January 2026 in the sum of USD 185,374.61, payable by 12 March 2026. It remains wholly unpaid. Ex. 7 at 1.

## E. Sums Due

39.

The unpaid principal for the three supplies is USD 489,544.48, broken down below:

| Delivery | Port | Invoice / note | Invoiced (USD) | Unpaid (USD) |
|---|---|---|---|---|
| 15 Oct 2025 | Los Angeles | K2502242 | 489,075.09 | 139,075.09 |
| 26 Nov 2025 | Singapore | K2503293 | 163,077.50 | 163,077.50 |
| 26 Nov 2025 | Singapore | K2503293-1 | 2,017.28 | 2,017.28 |
| 12 Jan 2026 | Colombo OPL | K2601011 | 185,374.61 | 185,374.61 |
| | | **Total** | | **489,544.48** |

40.

The sum above does not include the contractual late-payment interest under GTC clause 7.9—two percent per month from each invoice's due date, rising to three percent per month three months after the invoice date—accruing until IBT is paid in full. As of the date of this filing, accrued interest to which IBT is entitled as a matter of contract totals USD 158,003.78. IBT is further entitled under GTC clauses 10 and 16 to its costs of collection, including the legal fees and court costs of enforcing its maritime lien and right of arrest. Ex. 4 at 3, 5, 7.

**F. WG Marine had authority to bind the Vessel.**

41.

WG Marine ordered each of the three supplies for the Vessel. IBT is informed and believes, and on that basis alleges, that WG Marine was at all material times the party operating and commercially managing the Vessel and entrusted with her management at each port of supply, and was therefore a person authorized by the Owner to procure necessaries on the Vessel's credit within the meaning of 46 U.S.C. § 31341(a).

42.

Independently, the Vessel's Master or Chief Engineer accepted each delivery and signed and stamped each delivery document on the Vessel's behalf. The master of a vessel is presumed to have authority to procure necessaries for her. 46 U.S.C. § 31341(a)(2).

43.

IBT was never given, by the Owner, by the Master, by WG Marine, or by anyone else, any communication or notice—before, at, or after any of the three deliveries—that WG Marine lacked

authority to order bunkers on the Vessel's credit, or that the Vessel was being supplied on any credit other than her own.

44.

IBT was never furnished with a charterparty, a prohibition-of-lien clause, a no-lien stamp, or notice of any restriction on the authority of those ordering or receiving the bunkers, and IBT had no actual knowledge of any such provision or restriction at the time it contracted for or delivered any of the three supplies.

45.

The Vessel received the bunkers, and on information and belief consumed them in her own service.

**G. The London arbitration and the Final Award.**

46.

GTC clause 17.2 gives IBT the option to refer "any dispute, or collection of outstanding bunker invoices or obtaining maritime lien or breach, or existence, scope, or validity arising out of or in connection with this contract" to arbitration under the London Maritime Arbitrators Association Terms current when the arbitration is commenced, governed by English law and the Arbitration Act 1996. Ex. 4 at 7.

47.

Clause 17.2 further provides that although "[t]he reference shall be to three arbitrators," a party referring a dispute "shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within 14 calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party

appoints its own arbitrator and gives notice that it has done so within the 14 days specified." If the other party does not appoint within those fourteen days, the referring party "may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly," and "[t]he award of a sole arbitrator shall be binding on both parties as if he had been appointed by agreement." Ex. 4 at 7.

48.

IBT commenced arbitration by notice of 7 April 2026, served on WG Marine at operations@wgmarine.ch and on the Owner at welcome@victoria-marine.de, stating that IBT had commenced arbitration and had appointed its arbitrator. Neither respondent appointed an arbitrator. On 24 April 2026—seventeen days after the notice—IBT appointed its arbitrator, Marieke Witkamp, as sole arbitrator, and she confirmed her appointment to all parties the same day. *See* Final Arbitration Award, attached as Exhibit 12, at 3.

49.

IBT served its Claim Submissions on 27 April 2026. The respondents were given until 25 May 2026 to serve a defence, then a final and peremptory extension to 1 June 2026, and then a further final and peremptory opportunity until 9 June 2026 to answer IBT's supplementary submissions. No respondent filed anything at any stage of the reference. Ex. 12 at 3.

50.

By Final Award dated 3 July 2026, seat London, the sole arbitrator found WG Marine liable as the ordering party; found that WG Marine "had at least apparent authority to accept Claimant's offer to supply bunkers to the Vessel and to enter into three bunker supply contracts on behalf of the Owners"; and held the Owner bound by the GTC and jointly liable. Ex. 12 at 4-5.

51.

The Final Award adjudged WG Marine and the Owner jointly and severally liable to IBT for USD 570,332.86—being USD 489,544.48 in principal and USD 80,788.38 in interest accrued to 24 June 2026—together with interest at three percent per month from 25 June 2026 until payment; and ordered them jointly and severally to pay USD 60,000.00 as IBT's costs of the reference and GBP 3,500.00 for the arbitrator's fees and the cost of the award. The arbitrator further declared that IBT "has a contractual maritime lien, valid under the U.S. Codes referred to in this Award," against the Vessel in respect of the three supplies. IBT's claim in Count I does not depend on that declaration; the lien IBT asserts here arises by operation of United States law from the supply of the necessaries themselves. Ex. 12 at 6-9.

52.

The Final Award is final and binding under section 58(1) of the Arbitration Act 1996. The twenty-eight-day period under section 70(3) for any challenge under sections 67, 68, or 69 of that Act expired on 31 July 2026. IBT is informed and believes that no such application was made. The award is now final, unappealable, and enforceable under English law.

53.

No part of the Final Award has been paid.

## V.
## CAUSES OF ACTION

### Count I
### Action *In Rem* to Enforce a Maritime Lien for Necessaries
*Supplemental Rule C; 46 U.S.C. §§ 31341–31343*

54.

IBT repeats and realleges each preceding paragraph.

55.

The marine bunkers IBT supplied to the Vessel are "necessaries" within the meaning of 46 U.S.C. § 31301(4).

56.

IBT provided those necessaries to the Vessel on the order of the Owner or of a person authorized by the Owner within the meaning of 46 U.S.C. §§ 31341 and 31342. IBT provided them as the contracting supplier; the physical suppliers IBT engaged delivered the fuel under and pursuant to IBT's contracts of supply, and their performance is attributable to IBT.

57.

As to the Los Angeles supply, the bunkers were delivered to the Vessel in the United States, and United States law governs the existence of IBT's lien of its own force. Ex. 8 at 1–2.

58.

As to the Singapore and Colombo supplies, the parties expressly agreed that United States law governs the existence of IBT's maritime lien, wherever the bunkers were delivered and wherever proceedings are brought. GTC clause 3.2 provides: "The laws of the United States, including 46 U.S.C. §§ 31341, 31342 and 31343 (CIMLA), shall govern the existence of a maritime lien regardless of the jurisdiction of legal proceedings. The Seller may assert its lien, attachment or any other rights in any jurisdiction where the Vessel may be found." GTC clause 17.2 provides: "The Tribunal will apply General Maritime Law of the United States of America with respect to the existence of IBT's maritime lien." Clause 3.2 further recites the substance of 46 U.S.C. § 31341 and provides that the Owner, Master, Charterer, Disponent Owner, and any person entrusted with the management of the Vessel at the port of supply "shall each be deemed to have full authority to procure necessaries for the Vessel on its credit." Ex. 4 at 2, 7.

59.

That choice of law is express, is confined to the existence of the maritime lien, and is enforceable. The Vessel has come to the United States. IBT's lien accordingly arises by operation of United States law under 46 U.S.C. § 31342 as to all three supplies. Ex. 4 at 2, 7.

60.

By operation of 46 U.S.C. § 31342, IBT thereby acquired a maritime lien on the Vessel for the unpaid amounts of the necessaries, together with contractual interest and IBT's costs of collection. IBT is not required to allege or prove that credit was given to the Vessel. 46 U.S.C. § 31342(a)(3).

61.

IBT's lien is unsatisfied. The unpaid principal is USD 489,544.48, together with interest under GTC clause 7.9 and IBT's costs of collection under GTC clauses 10 and 16, including the costs of this action and of arresting the Vessel.

62.

IBT is entitled to enforce its lien by an action *in rem* against the Vessel, to have the Vessel arrested under Supplemental Rule C, and to have her condemned and sold to satisfy the lien.

**Count II**
**Recognition and Enforcement of a Foreign Arbitral Award**
*(9 U.S.C. §§ 201–208; New York Convention) — against WG Marine and Owner*

63.

IBT repeats and realleges each preceding paragraph.

64.

The Final Award dated 3 July 2026 is an arbitral award made in the territory of a State other than the United States, arising out of a commercial legal relationship that is not entirely between

citizens of the United States. It falls under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards. 9 U.S.C. §§ 202, 203.

65.

This action is brought within three years after the award was made. 9 U.S.C. § 207. Ex. 12 at 9. The Court "shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention." *Id.*

66.

IBT files with this Complaint a duly certified copy of the Final Award and of the arbitration agreement contained in GTC clause 17.2, as required by Article IV of the Convention. Ex. 4.

67.

WG Marine is a party to the arbitration agreement in GTC clause 17.2 and is bound by the award. Ex. 4 at 7; Ex. 12.

68.

The Owner is likewise bound. The three order confirmations that formed the bunker contracts were addressed on their face to the "Master / Owners / Charterers" of the Vessel and stated that the contracts were governed by the GTC. IBT's invoices were addressed the same way. The Vessel's Master or Chief Engineer signed and stamped each delivery document, and GTC clause 3.2 provides that a delivery note so signed "shall be deemed to be Incorporated with IBT's terms and conditions." The Owner's Vessel was nominated for, received, and consumed the bunkers supplied under those contracts, and the Owner thereby knowingly accepted the direct benefits of contracts it knew contained the GTC and the arbitration agreement within them.

69.

The tribunal was constituted under the sole-arbitrator default mechanism incorporated into

clause 17.2 of the GTCs. IBT gave notice of the reference and of its own appointment on April 7, 2026. Neither respondent appointed an arbitrator within the fourteen calendar days that clause allows—or at all—and IBT then appointed its arbitrator as sole arbitrator on 24 April 2026. Clause 17.2 provides that an award so made "shall be binding on both parties as if he had been appointed by agreement." Ex. 4 at 7.

70.

IBT is entitled to an order recognizing and confirming the Final Award and to judgment on it against WG Marine and the Owner, jointly and severally, for USD 570,332.86, with interest at the contractual rate from 25 June 2026 until payment, together with USD 60,000.00 and GBP 3,500.00.

**Count III**
**Maritime Attachment and Garnishment**
*(Supplemental Rule B) — against WG Marine and the Owner*

71.

IBT repeats and realleges each preceding paragraph.

72.

IBT has a valid *prima facie* admiralty claim against WG Marine and against the Owner, arising from the three maritime contracts for the sale and delivery of bunkers and from the Final Award rendered upon them.

73.

Neither WG Marine nor the Owner can be found within this District within the meaning of Supplemental Rule B(1). Each is a foreign company organized under the laws of a foreign state, and neither maintains an office, agent, or place of business within this District. *See* Declaration, attached as Exhibit 13.

74.

The Vessel is tangible property belonging to the Owner and is, or during the pendency of this action will be, found within this District.

75.

Maritime attachment is available to secure a maritime claim that has been referred to, or reduced to an award in, arbitration. 9 U.S.C. § 8.

76.

IBT is entitled to an order authorizing process of maritime attachment and garnishment against the Vessel as the property of the Owner, and against any other property of WG Marine or of the Owner found within this District, in the amount of IBT's claim, to secure IBT's *in personam* claims, contractual interest claim, and costs of the reference and the arbitrator's fees, which the maritime lien asserted in Count I may not secure. The total amount of IBT's *in personam* claim, including principal and contractual interest through the date of this filing, but excluding attorney's fees and costs, is USD 647,548.26.

## V.
## INDEMNITY IN FAVOR OF U.S. MARSHAL

77.

IBT agrees to release, hold harmless, and indemnify the United States of America, the United States Marshal for this District, and their deputies, agents, servants, and employees from any and all liability or responsibility for claims arising out of the arrest, attachment, or custody of the Vessel.

## VI.
## CONDITIONS PRECEDENT

78.

All conditions precedent have been satisfied and/or discharged.

79.

All and singular of the premises are true and within the admiralty and maritime jurisdiction of the United States and of this Honorable Court.

## VII.
## PRAYER

WHEREFORE, Plaintiff IBT Bunkering & Trading Mineraloelvertrieb GmbH & Co. KG respectfully prays that:

1. The Court review this Verified Complaint and the affidavit and supporting papers filed with it, determine that the conditions for an action in rem appear to exist, and enter an order under Supplemental Rule C(3)(a)(i) and Local Admiralty Rule 4.1(B) authorizing and directing the Clerk to issue a Warrant for the Arrest of the M/V LIMA STRAIT, in rem;

2. Process in due form of law issue against the Vessel, and all persons claiming any interest in her be cited to appear and answer under oath the matters alleged;

3. The Court adjudge that IBT holds a valid maritime lien on the Vessel for the unpaid price of the necessaries—USD 489,544.48—together with contractual interest and IBT's costs of collection, and that the Vessel be condemned and sold, with the proceeds applied to IBT's lien;

4. The Court recognize and confirm the Final Award dated 3 July 2026 under 9 U.S.C. § 207 and enter judgment on it against WG Marine SAGL and Lima Strait GmbH & Co. KG, jointly and severally, for USD 570,332.86, with interest from 25 June 2026 until payment, together with USD 60,000.00 and GBP 3,500.00;

5. That the Court determine that the conditions of Supplemental Rule B appear to exist and enter an order under Supplemental Rule B(1)(b) and Local Admiralty Rule 4.1(A) authorizing and directing the Clerk to issue process of maritime attachment and garnishment against the M/V LIMA STRAIT as the property of Lima Strait GmbH & Co. KG, and against any other property of the in personam defendants within this District, in the amount of IBT's claim;

6. The Court award IBT pre-judgment and post-judgment interest, its costs, and its attorneys' fees and expenses of collection as provided by GTC clauses 10 and 16 and by law; and

7. The Court grant such other and further relief as justice may require.

Respectfully Submitted:

*/s/ Alan R. Davis*
Alan R. Davis, T.A., La. Bar No. 31694
Adelaida J. Ferchmin, La. Bar No. 29589
R. Michael Herman, La. Bar No. 40818
adavis@twpdlaw.com
aferchmin@twpdlaw.com
mherman@twpdlaw.com
**TAYLOR WELLONS POLITZ & DUHE**
1555 Poydras Street, Suite 2000
New Orleans, Louisiana 70112
Telephone: (504) 525-9888
Facsimile: (504) 525-9899

***Attorneys for Plaintiff IBT Bunkering & Trading Mineraloelvertrieb GmbH & Co. KG***